ROSENBERGER (MOORE v.). See Case No. 9,774.

## Case No. 12,057.

### In re ROSENFELD.

[2 N. B. R. 116 (Quarto, 49);[1] 1 Am. Law T. Rep. Bankr. 100; 8 Am. Law Reg. (N. S.) 44.]

District Court, D. New Jersey. 1868.

BANKRUPTCY — FRAUDULENT PREFERENCES — CREDITS ALLOWED ON SALE — INSURANCE.

1. A, before insolvency, and not in contemplation of bankruptcy, indebted to B in the sum of two thousand four hundred and eleven dollars, sold to him an estate to the value of ten thousand dollars, and credited him on his books for the said sum of two thousand four hundred and eleven dollars, at the time of sale. Afterwards A, when insolvent and in contemplation of bankruptcy, had a settlement with agent of B, when the sum of two thousand four hundred and eleven dollars was deducted from the amount of purchase money. *Held*, that the payment was really made at the time of sale; that it was not an appropriation of payments, and that it was a legitimate transaction and not a fraudulent preference within the meaning of the bankrupt act [of 1867 (14 Stat. 517)].

2. Where specification charges that a particular debt was paid after passage of bankrupt act, and the proof shows that it was paid before, and proof is offered that there were other debts not mentioned in specifications that were paid after passage of said act, *held*, that the creditors are bound by the specification, and such proof is inadmissible.

[Cited in Re Jaycox, Case No. 7,239; Re Clark, Id. 2,812.]

3. Servants' wages paid after the passage of bankrupt act, as necessary family expenses, cannot be allowed as objection to discharge.

[Cited in Re Seeley, Case No. 12,628.]

4. Payments made to counsel for services "rendered and to be rendered" by bankrupt without fraud, is not a ground for refusal of discharge.

[Cited in Re Comstock, Case No. 3,074; Re Thompson, Id. 13,938; Re Boynton, 10 Fed. 279.]

[Cited in Re Parsons, 150 Mass. 345, 23 N. E. 50.]

5. Where a bankrupt, insolvent and in contemplation of bankruptcy, insured his life, it is an improper transaction.

6. Insurance made upon house and furniture in pursuance of covenants in lease is not a fraudulent preference.

[Cited in Re Seeley, Case No. 12,628.]

7. Expenditures incurred by bankrupt while insolvent, in support of family, and the evidence is silent as to their character, the court cannot admit such expenditures as a ground for refusal of discharge.

[In the matter of Isaac Rosenfeld, Jr., a bankrupt. For prior proceedings in this litigation, see Cases Nos. 12,058 and 12,059.]

Abbett & Fuller, for petitioner.

T. McCarter and Goepp & Stern, for opposing creditors.

FIELD, District Judge. This case comes now before the court, upon specifications filed by Marx & Co., creditors of the bankrupt, in opposition to his discharge. It is one of more than ordinary interest and im-

[1] [Reprinted from 2 N. B. R. 116 (Quarto, 49) by permission.]

portance. The petition was filed in June, 1867, very soon after the bankrupt act went into operation, and from that day to this has been keenly contested at every step, both before the register and before the court. The bankrupt has been subjected to repeated and most searching examinations. He has been required to give a minute account of all his business transactions, all his domestic arrangements, and all his family expenses, not only since the passage of the bankrupt act, but for a year preceding. His testimony is spread over two hundred and thirty-nine folios. A number of other witnesses have also been examined before the court. The arguments of counsel (submitted in writing) are full and exhaustive. They evince great diligence and research, and if I do not properly understand the case, and have failed to reach a right conclusion, it certainly is not owing to any fault upon their part. They have lightened very much the labor which would otherwise have been imposed upon me of searching among the mass of evidence for the material facts of the case. Mr. Rosenfeld was a broker, residing in New Jersey, but doing business in New York, and in May, 1866, deemed himself to be worth nearly a quarter of a million of dollars; but in one day, owing to a sudden and unexpected fluctuation in the price of gold, he became bankrupt. He at once made an assignment of all his property for the benefit of his creditors, except his homestead and furniture in Orange. In the schedule, however, annexed in the assignment, the validity of the claims against his estate, growing out of gold contracts, was denied, and has ever since been disputed by him. Negotiations for an amicable settlement with his creditors were for a long time pending, and were in progress up to within a week of the filing of his petition in bankruptcy.

His counsel, Mr. Maclay, testifies that so late as May 28, 1867, he had every reason to believe that such a settlement would be effected. I mention these facts because of their bearing upon some of the charges upon which much stress has been laid in the argument. Most of the specifications originally filed related to transactions which took place prior to the passage of the bankrupt act. Exceptions were taken to these specifications, upon the ground that acts done before the passage of the bankrupt law were not a good cause for refusing a discharge. These exceptions were sustained and new specifications were filed in accordance with the opinion of the court. It is these specifications which I am now to consider.

First. The first specification relied upon is, that on May 28th, 1867, being then insolvent and in contemplation of bankruptcy, the bankrupt paid to his uncle, Isaac Rosenfeld, in full, a debt of two thousand four hundred and eleven dollars and one cent; that the bankrupt was insolvent and in contemplation of bankruptcy, on the 28th of May, 1867, has been clearly shown. If he did, therefore, on that day pay to his uncle this debt of two thousand four hundred and eleven dollars and one cent, I think it would be a "fraudulent preference, contrary to the provisions of the act" within the meaning of the twenty-ninth section, and a good ground on which to refuse a discharge. But was this payment in fact made on the 28th of May, 1867? The evidence shows that on the 4th of January, 1867, the bankrupt sold to his uncle, Isaac Rosenfeld, certain real estate for the sum of ten thousand dollars, and that he was at that time indebted to his uncle in the sum of two thousand four hundred and eleven dollars. On the 28th of May, 1867, a settlement was had between the bankrupt and Moses B. Maclay, Esq., the agent of his uncle, and in that settlement, this debt of two thousand four hundred and eleven dollars was deducted from the amount of the purchase money, and the balance paid in cash. Now, it is insisted, that inasmuch as "the purchase money was not appropriated nor disposed of before the 28th of May, 1867," therefore, this payment of two thousand four hundred and eleven dollars, must be considered as having been made on that day. But, it seems to me, there is not the slightest foundation for such an idea. The doctrine of appropriation of payments has no reference to a transaction of this kind. The payment was really made at the time of the purchase of the real estate. From that time, the bankrupt could have had no claim to anything but the balance of the purchase money after the payment of the debt. When the settlement took place on the 28th of May, 1867, it was not for him to say whether this should be deducted from the purchase money or not. He had no power to prevent it. Such would have been the legal effect of the transaction, if nothing had been said or done by either of the parties in relation to it. But the evidence would seem to show, that in point of fact, Isaac Rosenfeld, the purchaser, at the time of the sale, credited the bankrupt on his books with the amount of the purchase money, and charged him with this debt of two thousand four hundred and eleven dollars, leaving a balance due to him, which was paid on the 28th of May, 1867. It was a legitimate transaction, and I see nothing in it to sustain the charge of a fraudulent preference within the meaning of the bankrupt act.

Second. The second specification is, that after the passage of the act, being insolvent and knowing himself to be so, and in contemplation of bankruptcy, he paid to W. B. Tricknor & Co., a debt of one hundred and fifty-four dollars and thirty cents. The answer to this is, that the specific debt was paid in 1866, and not after the passage of the bankrupt act. But it is insisted, that there were bills of W. B. Tricknor & Co., paid in May and June, 1867, and that these bills amounted, in the aggregate, to more

than one hundred and fifty-four dollars and thirty cents, and, therefore, that the charge contained in the specification has been substantially sustained. That is, the specification charges that a particular debt was paid after the passage of the bankrupt act, and when it is shown that this debt was paid in 1866, then proof is offered that there were other debts, not mentioned in the specification, that were paid after the passage of the act. Such proof is inadmissible. The opposing creditors are bound by their specifications. They cannot go beyond them, or produce evidence outside of them. Where would be the use of specifications if this were not so. Instead of apprising the bankrupt of the specific grounds upon which his discharge was to be opposed, they would only tend to deceive and mislead him.

Third. The fifth specification is, that the debt of one hundred and fifty-four dollars and forty-four cents due to J. C. Harden was paid after the passage of the bankrupt act. But the evidence shows that this debt, too, was paid in 1866. And then it is said there was another debt of sixty-six dollars and forty-five cents, that was paid March 30th, 1867. All that I have said with regard to the second specification is applicable to this.

Fourth. So, too, with regard to the sixth and seventh specifications. They charge that certain debts were paid after the passage of the bankrupt act, while the evidence is that they were paid in 1866.

Fifth. The eighth specification is, that after the passage of the bankrupt act, he paid servants' wages to the amount of one thousand four hundred dollars. This charge is not sustained by the evidence. The bankrupt testified, both before the register and in court, that this one thousand four hundred dollars, mentioned in his schedule as servants' wages, covered a period of about fourteen months; that while it was not the same during the whole time, yet the average amount was something like one hundred dollars per month; and it was paid from month to month as it fell due. No attempt has been made to discredit his testimony. It seems, then, that instead of paying one thousand four hundred dollars for servants' wages after the passage of the bankrupt act, he paid but four hundred dollars. It was paid from month to month as it became due. It was a part of his necessary family expenses. But it is said Mr. Rosenfeld had no right to pay even four hundred dollars for servants' wages, after the passage of the bankrupt act. As he intended to apply for its benefit and avail himself of its provisions, he ought at once to have reduced his establishment, retrenched his expenses, discharged his servants and adopted an entirely different style of living from that in which he had previously indulged. Now, if the specific charge had been that the sum of four hundred dollars for servants' wages for a period of four months was an extravagant sum, for a man situated as Mr. Rosen-

feld was, to pay, that it could not be fairly regarded as coming under the head of necessary family expenses, and must be treated as a fraudulent preference, or payment or transfer of property contrary to the provisions of the act, there might have been force and pertinence in these observations. But the specification charges an entirely different thing. It charges that the bankrupt, after the passage of the act, paid one thousand four hundred dollars for servants' wages, that is, not only the four hundred dollars which accrued after the 2d of March, 1867, but also one thousand dollars which had accrued prior to that day. Had this charge been true, such a payment might well have been considered a fraudulent preference. This was the charge that the bankrupt was called upon to meet, and no other. He has met it and has shown that it is entirely unfounded.

Sixth. The ninth and tenth specifications may be classed together. They charge the bankrupt with having paid, after the passage of the act, to Moses B. Maclay, Esq., the sum of one thousand dollars, and to Messrs. Abbett & Fuller the sum of one thousand six hundred and eight dollars and seventy-seven cents, part of which sums were for past professional services.

The charge contained in these specifications is somewhat vague, it not being stated how much was paid for past and how much for future services. It appears, however, from the evidence, that of the one thousand dollars paid to Mr. Maclay, two hundred and fifty dollars were for past services, and of the one thousand six hundred and eight dollars and seventy-seven cents paid to Abbett & Fuller, six hundred and eight dollars and seventy-seven cents were for past services. The bankrupt had a right to employ counsel. Their professional services were absolutely necessary for him. It was natural that he should resort to those whom he knew and had formerly employed, and in whom he had confidence. And it was natural, that before consenting to act in a case which would necessarily require much time and labor, they should insist upon being paid an amount that would cover both past and future services. Mr. Abbett, in his testimony before the court, stated that before he consented to take charge of the case in bankruptcy, he told Mr. Rosenfeld that he would have to pay him for what he had already done for him, and also the sum of one thousand dollars. And Mr. Maclay says he "charged him one thousand dollars for services rendered and to be rendered." The bankrupt was obliged to comply with these demands or forego the services of these gentlemen, and employ other counsel. This, no doubt, he might have done; and, strictly speaking, he had no right to pay them a debt due for past services. But I see no evidence of fraud upon the part of the bankrupt in these transactions, and, I think, it would be a harsh construction of the bankrupt act to pronounce them fraudulent pref-

erences within the meaning of the twenty-ninth section, and on this account alone refuse a discharge. If the strict rule contended for by the counsel of the opposing creditors were to prevail, the payment of a debt, however small, through inadvertence or under a mistaken sense of duty, and without any fraudulent intent whatever, would be sufficient in all cases to deprive a bankrupt of his discharge. I do not believe that the framers of the act ever intended that it should receive so rigid a construction.

Seventh. The eleventh specification is, that the bankrupt, on the 1st of June, 1866, knowing himself to be insolvent, and in contemplation of bankruptcy, invested six hundred and forty-one dollars, as the premium for one year, on two policies of insurance on his life, taken by him for the benefit of his wife and children. The facts alleged in this specification are fully proved, and are not disputed. The explanation given by the bankrupt of this transaction is, in substance, as follows: "On the 22d day of May, 1866, he had made an assignment for the benefit of his creditors. In May, 1867, he entered into a negotiation with the assignees for the sale of his wife's right of dower in certain real estate included in the assignment. They agreed to give him four thousand dollars for it, and he determined to invest the money thus obtained in payment of premiums upon a life insurance for the benefit of his wife. Believing that this agreement would be carried out by the assignees, and desirous of having the insurance effected with as little delay as possible, he advanced six hundred and forty dollars of his own money in payment of the premiums, intending to replace it out of the four thousand dollars as soon as received. He further stated that he had consulted his counsel, Mr. Maclay, in relation to the matter, and understood him to say that there was nothing wrong or improper in the transaction. Mr. Maclay, says, however, that Mr. Rosenfeld must have misapprehended him, and that he gave him no such advice or opinion. It turned out that the four thousand dollars was never received from the assignees. They refuse to consummate the bargain, and allowed the real estate to be sold subject to the right of dower. But the six hundred and forty dollars had been paid, and Mr. Rosenfeld was unable to replace it. If this is a correct account of the affair, while I see in it no evidence of fraud on the part of the bankrupt, still I have no hesitation in saying that it was an improper transaction, and one of which the creditors have a right to complain. The bankrupt clearly had no right to withdraw this money from the estate. It belonged to his creditors. His counsel says that this cannot be considered as a fraudulent gift or conveyance of any part of his property. It was a mere loan to his wife, with the prospect of having speedily in his own hands the means of repayment. But the answer given to this, by the counsel of the creditors, is a correct

one. If it were a loan to his wife, to be replaced out of her dower, then she is indebted to the estate to that amount, and the bankrupt ought to have included the claim in his schedule of assets. This, however, I understand the bankrupt virtually admits, and his counsel now consents that the court shall order the schedule to be amended in such a way as to include this six hundred and forty dollars in the assets of the bankrupt. I see no objection to the course being taken, and then there will have been not only no intention on the part of the bankrupt to defraud, but no one, in fact, will be defrauded.

Eighth. The twelfth specification is, the payment of one hundred and eighteen dollars and eighty cents for insurance on the house and furniture, at Orange. The answer given to this is, that the payment of the insurance was made in pursuance of a covenant contained in the lease. It was a part of the rent, and if it had not been paid the lease would have been forfeited. The counsel of the creditors suggests, as worthy of remark, that the bankrupt had a term yet unexpired, in this Orange property, which might have been a valuable asset in the hands of the assignee. If this were so, then it was his duty to pay the insurance, and instead of being a fraud upon the creditors, it was for their benefit, for otherwise the lease would have been forfeited, and there would have been no longer an unexpired term to dispose of. This view of the case is not at all altered by what the counsel further suggests, namely, that the bankrupt, by the deed and release, by which Mr. Maclay insisted upon his executing, extinguished the term of years, and thereby deprived his creditors of the benefit of it, for such a charge is nowhere contained in any of the specifications. The payment of this insurance cannot, in any point of view, be deemed a fraudulent preference.

Ninth. The thirteenth, fourteenth and fifteenth specifications relate to expenditures incurred by the bankrupt from May 22d, 1866, to June 22d, 1867, embracing a period of thirteen months. They were as follows: Paid to

| | |
|---|---:|
| Miscellaneous tradesmen | $3,759 41 |
| Grocer | 691 49 |
| Butcher | 1,159 23 |
| Total | $5,610 13 |

With regard to the amount paid to miscellaneous tradesmen, the specification does not charge, nor is there any evidence to show how much of this was paid prior to the 2d of March, the date of the bankrupt act, and how much was paid afterwards. It is true, that the bankrupt on his examination before the register says, that his probable expenditures during this period of thirteen months was six hundred and fifty-five dollars per month; but this result was arrived at by adding together the whole amount of payments made during this period and dividing it by the number of months embraced in it. Whether his monthly expenditures were the same, after the

passage of the bankrupt act as they were before, nowhere appears. They may have been very much reduced. The evidence is entirely silent upon this point. I presume it will not be contended that a man had not a right, after the passage of the bankrupt act, to spend money for his necessary family expenses, notwithstanding he contemplated availing himself of its provisions; and how is it possible for me to say, in the absence of all evidence upon the subject, how much of this sum of three thousand seven hundred and fifty-nine dollars and forty-one cents was paid after the 2d of March, 1867, and whether it was or was not for necessary expenses. The same remarks apply to the grocer's and the butcher's bills. They both cover a period of about thirteen months, extending from May, 1866, to June, 1867, and it is not alleged in the specifications, nor is there evidence to show, how much of them were paid before the passage of the bankrupt act, and how much afterwards. Mr. Harden, the grocer, in his testimony before the court, states that no wines were purchased, but only ordinary groceries, and that they were paid for each week by Mr. Rosenfeld. He also swears that the quantity of groceries purchased of him by Mr. Rosenfeld, after his failure, was from twenty to forty dollars per week less than it had been before.

Tenth. The sixteenth specification is, that on the 28th of May, 1867, the bankrupt, knowing himself to be insolvent and in contemplation of bankruptcy, received from his uncle the balance of the purchase money for the house in Orange, and appropriated it in part to the payment of preferred creditors, in part to the premium on his life insurance of six hundred and forty dollars, and in part to extravagant living. Now, it will at once be perceived, that this specification is nothing more than a recapitulation of the several charges contained in the other specifications. The only difference between them is, that there they are presented separately while here they are grouped together. But inasmuch as these charges, when made separately, have all been considered and disposed of, it will hardly be thought necessary to spend time in the examination of them, when they are thus combined. I have thus gone over all the specifications relied upon as grounds upon which to oppose the bankrupt's discharge. I have carefully examined all the evidence in connection with them. I have read attentively and duly weighed the elaborate, and I may add, the very able arguments submitted to me by the counsel on both sides, and the conclusion to which I have come is, that the opposing creditors have not succeeded in making out a case, either of "fraudulent preference, or fraudulent payment, gift, transfer, conveyance or assignment," by the bankrupt of any part of his property, within the meaning of the twenty-ninth section of the act.

The only charge upon which, if distinctly presented, I might have felt some doubt and hesitation, is that which relates to the style of living in which the bankrupt indulged, and the kind of establishment which he kept up after the passage of the bankrupt act, and after he had determined to apply for the benefit of it. The counsel of the creditors have, in their argument, returned to this subject again and again, and made many just and striking observations in relation to it, and I confess that the impression made upon my mind is, that the family expenses of the bankrupt during the period in question, were unnecessarily large—larger than ought to have been incurred by one in his circumstances. But it is only an impression, and a somewhat vague one, too, for the evidence furnishes us no means of knowing what these expenses really were. But were it more clear and distinct, I should be unwilling to refuse a discharge to the bankrupt upon any ground not expressly set forth in the specifications. In no one of the specifications filed, is this charge distinctly presented. The burden of all the specifications is fraudulent preferences or payments. Nowhere is it alleged, that the family expenses paid by the bankrupt after the 2d of March, 1867, were not necessary expenses. The only specification in which the subject of "extravagant living" is at all alluded to is the sixteenth, which is, as I have said before, a mere recapitulation of former specifications, and evidently not intended to introduce any new charge. Then, too, we must take into consideration the fact to which I have before adverted, that as late as May, 1867, the bankrupt had reason to expect that an arrangement would be made with his creditors, and that it would not be necessary for him to apply for the benefit of the bankrupt act. Mr. Maclay expressly says, that up to that time he had been endeavoring to arrange the gold debts of Mr. Rosenfeld, and believed that he would be successful in his efforts to do so. This, perhaps, might, to some extent, have justified the bankrupt in keeping up his establishment, and continuing to live in a way which, under other circumstances, would not have been proper.

On the whole, I am of the opinion that the bankrupt is entitled to his discharge.